111 A.3d 733

JAMIE CAMERON, PLAINTIFF, v. BRIAN
CAMERON, DEFENDANT.

Superior Court of New Jersey
Chancery Division Family Part
Ocean County

Decided November 17, 2014.

*Bianca M. Sangiovanni* for plaintiff.

*Brian Cameron,* defendant, pro se.

L.R. JONES, J.S.C.

This case presents a legal issue of first impression regarding the statutory interpretation of *N.J.S.A.* 2A:17–56.21(a) ("information provided to credit reporting agencies"), and the reporting of child support arrears as a delinquency on an obligor's credit report. For the reasons set forth in this opinion, the court holds that the statute applies in cases where a parent fails to honor an existing child support order, but does not equitably apply in situations where an obligor suddenly owes arrears as the result of a retroactively imposed or increased support order.

## FACTUAL HISTORY

Plaintiff and defendant divorced in 2008, following a long-term relationship and three-year marriage. At the time, the parties entered into a settlement agreement in which they agreed to share joint legal custody of their six year old daughter, K.C., with plaintiff having primary residential custody, and defendant serving as parent of alternate residence with reasonable parenting time. The parties further agreed that defendant would pay plaintiff child support of $75 per week.

Subsequently, K.C. began living with defendant, without objection of either party. This situation endured for a lengthy period of time. On July 18, 2014, defendant filed a post-judgment motion for a court order modifying the prior agreement, and formally declaring defendant to be the child's primary residential custodian. Additionally, defendant sought formal termination of his ongoing child support obligation to plaintiff, and the establishment of plaintiff's weekly child support obligation as the non-custodial

parent. Defendant further requested that the court make plaintiff's new child support obligation retroactive to the motion filing date of July 18, 2014, pursuant to *N.J.S.A.* 2A:17–56.23(a).

Originally, the family court clerk's office scheduled defendant's motion for a return date of September 26, 2014. At that time, both parties appeared in court and participated in the proceedings, which involved disputed issues of custody and child support. For various reasons, including (a) the need to schedule an in camera child interview under *Rule* 5:86, and (b) the further need for the parties to submit updated case information statements and other relevant financial documentation for the child support analysis, the court carried and continued the matter to November 17, 2014. In the interim, the court suspended defendant's child support obligation to plaintiff.

On November 17, 2014, the hearing continued. At the conclusion, the court entered an order retaining the parties' status as joint legal custodians, but granting defendant primary residential custody of K.C. Additionally, the court formally granted defendant's application to terminate his child support obligation, retroactive to his original motion filing date of July 18, 2014. Further, by applying New Jersey's *Child Support Guidelines,* Appendix IX–A to *Rule* 5:6A, the court established plaintiff's new child support obligation to defendant in the amount of $86 per week, retroactive to the original motion filing date of July 18, 2014, and payable through the Ocean County probation department.

The period between the July 18 filing date and the November 17 conclusion of the litigation totaled 122 days, or 17.43 weeks. As a result of the retroactive nature of the new child support order, plaintiff owed defendant $1499 in technical arrears ($86 per week × 17.43 weeks), and was directed to repay such arrears at an additional $14 per week on top of her ongoing, $86 per week prospective child support obligation, for a total child support obligation of $100 per week.

Plaintiff ultimately accepted both her retroactive child support obligation, and the arrearage repayment schedule, without objec-

tion. She raised a concern through counsel, however, about the negative consequence such arrears might have if reported as a delinquency. The court found the concern to be legitimate and relevant under the circumstances, particularly given the negative effect which delinquent child support arrears may have on one's credit report.

Under a strict interpretation of the statutory language in *N.J.S.A.* 2A:17–56.21(a) and (b), an obligor who owes child support arrears is potentially subject to various legal consequences, including probation's reporting of the arrears to credit reporting agencies. The question, however, is whether the terms and spirit of the statute require the reporting of technical arrears against a non-custodial parent who has never violated a support order or missed any legally specified payments, in the same manner as against an obligor who has failed to make payments or otherwise violated an existing order. The court holds that the answer is no.

## *LEGAL ANALYSIS*

■ As regarding the interplay between child support arrears and credit reporting, the applicable statutory provisions are *N.J.S.A.* 2A:17–56.21, sections (a) and (b), which state the following [1]:

Overdue support; release of information to consumer or credit reporting agency by state IV–D agency.

a. The State IV–D agency shall have the authority to make available the name of any delinquent obligor and the amount of overdue support owed by the obligor to credit reporting agencies, subject to the conditions set forth in this section and privacy safeguards established by the Commissioner. This information shall be provided only to an entity that has demonstrated to the satisfaction of the State IV–D agency that the entity is a credit reporting agency.

b. In all Title IV–D cases where the obligor is in arrears, the information shall be made available to credit reporting agencies.

---

[1] "IV–D" references the Title IV–D Child Support Program, funded through the federal and state governments and managed in New Jersey by the Department of Human Services, Division of Family Development, in partnership with the Superior Court Family and Probation Divisions.

The statutory language does not define a minimum amount of arrears for mandatory reporting. In practice, however, probation generally utilizes an arrearage threshold of $1000 to institute the credit reporting process. The Administrative Office of the Courts (AOC) expresses this point in a series of public education pamphlets. Pursuant to *N.J.R.E.* 201(b), the court takes judicial notice of the content of these publications, which are produced and disseminated by the State of New Jersey.

As stated in Section 2.1.1, page 45 in the *New Jersey Automated Child Support Enforcement System Manual:*

(O)nly cases where the obligee has applied for IV–D services are eligible for the credit reporting remedy. Thus, spousal support only cases are ineligible. Likewise, initiating interstate cases and cases exempted by court order are not eligible. Bankruptcy alone is not an exemption criterion. While New Jersey has no minimum threshold, in practice, obligors owing more than $1,000 in arrears qualify for this remedy.

[available at http://www.state.nj.us/treasury/purchase/bid/attachments/37829–d13. pdf (last visited January 2, 2015)].

The State's recitation of the $1000 threshold is expressly reiterated and emphasized in other publicly disseminated informational materials and governmental publications as well, including "A Lawyer's Guide to Child Support Services in New Jersey," and "Credit Reporting of Child Support Debts." *See* "A Lawyer's Guide to Child Support Services in New Jersey," available at https://www.judiciary.state.nj.us/probsup/11397_lawyers_guide_cs_ booklet.pdf, p. 11 (last visited January 2, 2015) ("Whenever an obligor owes $1,000 or more in past-due child support, the delinquency can be reported to consumer credit reporting agencies . . . Unpaid support on a credit report can affect the obligor's credit rating"); *see also* "Credit Reporting of Child Support Debts," p. 2, https://www.judiciary.state.nj.us/prose/10751_credit_reporting_cs_ debts.pdf (last visited January 2, 2015) ("If you are a person who owes a debt in a child support case in New Jersey, and if you owe at least $1,000, your debt may be reported to credit reporting agencies. Your credit report will be available to creditors, lenders, and employers or others who contract with credit reporting agencies.")

*N.J.S.A.* 2A:17–56.21 was originally enacted in 1985 and was amended in 1998. The purpose behind the statute was in part reflected in the original legislative statement, which stated the following:

> In the Child Support Amendments of 1984 (*Pub.L.* 98–378), the federal government recognized delinquent child support payments as a national problem and provided that certain measures be taken by the states to enforce support orders by October 1, 1985. A state may lose its federal matching funds if the state does not act. . . . (T)he State is required in all IV–D cases in which the amount of overdue support exceeds $1,000.00, and at the State's option in all other cases, to make available the information to consumer reporting agencies.

The legislative statement reveals that the purpose of the statute was to address the problem of *delinquent* obligors. There is nothing in the history which reflects that the Legislature intended for the consequences of this statute to also apply to a *non-delinquent* obligor, who technically owes money only as the result of a retroactively imposed order, but who has never missed a payment or otherwise violated the order itself. In fact, there is no compelling evidence that the Legislature considered this technical circumstance, much less explicitly intended to treat and categorize a technical obligor as a "delinquent" payor, subject to the same legal consequences as an obligor who defiantly fails to honor an established and existing order.

As an arm of equity, the court notes that "owing support" and being "delinquent on support" are not always one and the same. A debtor may owe money without being delinquent. In our credit-driven society, people constantly owe balances on one outstanding invoice or another without such bills being considered "delinquent" for legal purposes. It is only when payments are missed or late beyond certain pre-determined and established due dates and deadlines that the term "delinquency" begins to apply.

*Black's Law Dictionary* defines "delinquent" as "failing to perform an obligation." *Black's Law Dictionary* (p. 520) (10th ed.2014). In the realm of child support orders, one cannot be "delinquent" in meeting an identified and quantified court-ordered obligation before the order even exists. Yet, due to the nature of a retroactively imposed obligation, it is possible that one can owe

child support arrears, even in excess of $1000, without having ever missed a court-ordered payment. This situation can occur not only following an application for an initial child support order, but also following a successful motion by a custodial parent for a change-of-circumstance increase in existing child support, retroactively imposed to the motion filing date.

Under *N.J.S.A.* 2A:17–56.23(a), a court may retroactively establish or increase one's child support obligation back to at least the filing date of the application, or forty-five days earlier upon service of advance written notice.[2] Given both the factual and legal complexities of some family dynamics and issues, along with the over-congested nature of present-day family court dockets, it is unrealistic to expect that every custody and support case can be completed in one day. As exemplified in the present case, it is not at all uncommon for initial court dates to be adjourned, rescheduled, carried, or continued for one legitimate reason or another, including but not limited to illness, unavailability of a party or witness, attorney scheduling conflicts, the need for further financial documentation or other relevant evidence from one or both parties, or the necessity for more testimony and court time to simply conclude an ongoing matter. When a case is carried and continued, this circumstance naturally increases the gap of time between the original filing date of an application and the conclusion of the case. The greater this gap of time is, the greater the

---

[2] Under the anti-retroactivity statute, there are some circumstances when support may be modified to a date prior to a motion filing date, such as when a party writes a letter of intent to file a modification motion within forty-five days. Further, the anti-retroactivity statute does not necessarily apply to motions to retroactively emancipate a child and terminate child support. *See Bowens v. Bowens*, 286 *N.J.Super.* 70, 668 A.2d 90 (App.Div.1995), and *Mahoney v. Pennell*, 285 *N.J.Super.* 638, 667 A.2d 1119 (App.Div.1995). Additionally, there is prior authority for the proposition that when dealing with a request to *increase* rather than *decrease* support, the anti-retroactivity provisions of *N.J.S.A.* 2A:17–56.23, may not necessarily apply, and a court may in some instances retroactively increase support to a date earlier than the filing date of the motion or forty-five day written notice. *See Keegan v. Keegan*, 326 *N.J.Super.* 289, 294–95, 741 A.2d 134 (App.Div.1999).

chance is that there may be a substantial amount of technical child support arrears retroactively owed by the obligor by the end of the litigation.

The accrual of technical arrears arising from a retroactively established or increased child support obligation can be significant, particularly in the context of a pendente lite support order. A pendente lite order is an order entered by the court at the start or middle of divorce litigation, without prejudice and subject to retroactive modification at final hearing once all other evidence is presented for consideration. The gap of time between a pendente lite motion at the start of a case, and a trial at the conclusion of a case, can be unavoidably lengthy. Yet, the anti-retroactivity provisions of *N.J.S.A.* 2A:17–56.23, which generally prohibit retroactive modification of existing support orders prior to the motion filing date, do not apply to retroactive revisions of pendent lite support orders. *See Mallamo v. Mallamo*, 280 *N.J.Super.* 8, 12, 654 *A.*2d 474 (App.Div.1995). Nor must a litigant demonstrate a substantial change of circumstances under *Lepis v. Lepis*, 83 *N.J.* 139, 157, 416 *A.*2d 45 (1980), in order to seek and obtain retroactive modification of a pendente lite support order.

By way of example, if at the beginning of a contested divorce, the court enters a pendente lite child support order of $100 per week, this obligation may remain in place for months or longer while the litigation continues. Hypothetically, if one year passes between entry of the pendente lite order and the divorce trial, the non-custodial parent may in fact dutifully make every child support payment of $100 per week on time. Following trial, however, if the evidence reflects that the support figure should have been higher, the court may retroactively increase the previously imposed obligation. If the court adjusts and increases the obligation by only a slight amount such as $20 per week, the non-custodial parent now instantaneously owes $1040 in child support arrears, (52 weeks times $20 per week), even though he or she has never been out of compliance with the previously existing order.

For this reason, there is a legitimate concern with strictly and literally interpreting the language of *N.J.S.A.* 2A:17–56.21 so as to require the mandatory reporting of child support arrears against the credit report of a person who has never been delinquent in child support, but only technically owes arrears as the sole result of a retroactively imposed or increased child support order. While a credit report may reflect the child support arrears and the amount due, there may not be any other explanatory information at all, such as the distinction between due and overdue support, or the fact that the arrears resulted from a retroactively imposed child support obligation as compared to a pure delinquency and violation of an existing order. The reporting of such arrears as a delinquency may potentially mislead a proposed lender, or anyone else reading and relying upon the obligor's credit report, into believing that the obligor is out of compliance with court-ordered financial obligations.

Of equally compelling concern is the technological reality that we live in a computer-driven society. It is this court's understanding that the procedures in a probation office to implement child support enforcement now often involve a highly automated process following entry of initial data. This development is natural, due to electronic advancement in the workplace and the very high volume of support files which probation must process and manage on a daily basis. When a support account is established, certain information is manually entered, such as the effective date of the order, the amount of the obligation, and the amount paid to date. The computer then automatically calculates the arrears, and keeps a running tab on such arrears so long as the account remains open. If and when the computer reads numerical arrears as reaching a certain level, this event may automatically trigger and initiate the start of the credit reporting process.

A computer which is pre-programmed to act and function in a certain situation will do so absent human intervention and override. An example of how this situation can potentially cause complications is demonstrated by the following hypothetical situa-

tion, where the probation department has two separate child support files. In the first case, the obligor owes $1000 in child support arrears, resulting from a delinquent obligor's defiance of a court order. In the second case, the obligor also owes $1000, but solely as the result of a retroactively imposed or increased order which he or she has always honored. In each case, an automated computer program which reads and acts upon specific numerical arrearages may treat the two cases identically, because the arrears are in fact the same in both cases. As a result, the initiation of the process for potential credit reporting may be identical as well.

A computer, however, cannot decide legal issues. While there is an appeal process for credit reporting, and while it is therefore possible that an obligor may attempt to object or otherwise legally intervene before the credit reporting actually takes place, there is also the possibility that such efforts will be time-consuming and unsuccessful. This is especially true since the issue is not one of erroneous data entry, but rather one of correct data entry of the technical arrears, and statutory interpretation of what must occur under *N.J.S.A.* 2A:17–56.23(a) and (b) once the arrears reach a certain threshold.

The issue of the applicability, or non-applicability, of mandatory credit reporting consequences for retroactively imposed child support arrears is a legal issue of statutory interpretation which is most appropriately decided by a court, not by an electronic program or by a probation department whose primary function is to enforce court orders. In the present case, the reality is that unless a court (a) first interprets the meaning of the statute and concludes that the statute does *not* require the reporting of such technical arrears to the credit reporting agency, and (b) thereafter enters an order directing probation to refrain from reporting of such arrears unless and until further order, probation may still potentially initiate the credit reporting process against an obligor even though he or she has never violated a court ordered financial obligation at all.

This court has carefully contemplated not only the exact statutory language of the credit reporting statute, but also a reasonable interpretation of its terms given the purpose of the Act. Canons of legislative construction instruct that language in a statute should be interpreted in a common sense manner, consistent with the plain meaning of the text. *See State ex rel. K.O.*, 217 *N.J.* 83, 91–92, 85 *A.*3d 938 (2014); *State v. Carreon*, 437 *N.J.Super.* 81, 96 *A.*3d 305 (App.Div.2014). Further, the New Jersey Supreme Court has held that courts should strive to construe written statutes, rules and laws in a manner which avoids an absurd or illogical result, even when same appears to be dictated by a literal interpretation of the language. *Hubbard ex rel. Hubbard v. Reed*, 168 *N.J.* 387, 392–93, 774 *A.*2d 495 (2001); *See N.J.S.A.* 1:1–1. As aptly observed long ago by Judge Learned Hand, "there is no surer way to misread any document than to read it literally." *Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir.1944) (concurring opinion). *See Siegel v. Siegel*, 243 *N.J.Super.* 211, 215, 578 *A.*2d 1269 (Ch.Div.1990) (applying concept to interpretation of court rule).

When there is a legitimate question or ambiguity over whether the Legislature intended for an enactment to cover a certain situation, it is logical and appropriate for a court to presume that the Legislature at all times intended and desired to act fairly, equitably, and reasonably. In the realm of family court, there is an appropriate distinction between a delinquent party who owes money in violation of a court order, and another party who has never violated the financial provisions of any order. A statutory interpretation which treats these obligors identically in terms of consequences ignores the fundamental difference between the two situations, and replaces a fact-driven analysis with a generic, cookie-cutter, numbers-only approach which has little place in a court of equity.

The concept of reporting an obligor to a credit bureau before he or she has had a fair and reasonable chance to address and repay newly imposed retroactive arrears is inherently ques-

tionable. To fully appreciate why this is so, it is critical to consider the economic significance which credit reports, credit scores, and creditworthiness presently have in everyday American life. While there is little developed New Jersey family court case law on this issue, the relevance of a healthy credit report, and the paramount interest which every person has or should have in protecting and improving one's credit profile, cannot be overstated. We live in an era of recent severe economic downturn in the United States. *Piscitelli v. Classic Residence*, 408 *N.J.Super.* 83, 114, 973 *A.*2d 948 (App.Div.2009); *Benjamin v. Benjamin*, 430 *N.J.Super.* 301, 305, 64 *A.*3d 247 (Ch.Div.2012). Against this backdrop, and pursuant to *N.J.R.E.* 201(b), this court takes judicial notice that a positive credit report is one of the most important and valuable resources a party may possess. This point is especially relevant following divorce or other life-altering circumstances which may require a person to financially rebuild his or her entire life.

A strong credit rating and score can enable one with relatively limited income and assets to confront economic hurdles by borrowing money at relatively reasonable rates, and leveraging available credit limits to make necessary and substantial purchases or investments which might otherwise be unaffordable. Reciprocally, a negative credit rating and score may invariably have a detrimental effect on a party's economic health, often crippling if not crushing a party's reasonable ability to obtain loans or credit for significant and necessary purchases such as a house, a car, tuition, or other large and important expenditures. A damaged credit report can potentially cause financial harm to an individual who otherwise has a healthy credit score, particularly in an age where one's credit report is a regularly anticipated part of a standard background check regarding applications for loans, mortgages, rental applications, certain employment, or general security clearance.

The significance of a healthy credit report has been underscored in pronouncements by both our state and federal governments.

According to the State of New Jersey's Department of Banking and Insurance official website:

> (C)redit information is used in virtually every aspect of American financial life.... Consumer credit is considered when applying for loans to buy homes and automobiles. Credit checks are required to get utility, telephone and other services. Few landlords will rent apartments or houses without ordering a credit report, and credit may also affect an employer's hiring and promoting decisions.
> [http://www.state.nj.us/dobi/division_consumers/finance/credit_idtheft.htm (last visited January 2, 2015) ].

The Department of Banking website further explicitly comments that a credit report is often used to determine whether additional credit should be extended to a person, as a measure of such person's "financial responsibility." http://www.state.nj.us/dobi/division_consumers/finance/credit_idtheft.htm (last visited January 2, 2015). A credit score is a single numerical score, based upon an individual's credit history, which purports to measure an individual's creditworthiness. The model for calculating one's score considers many factors, including but not limited to "amount of outstanding debt," and "negative information" such as "late payments." http://www.nj.gov/dobi/division_consumers/finance/creditreport2.htm (last visited January 2, 2015).

On a federal level, Congress has recognized the importance of one's credit report by enacting the Fair Credit Reporting Act (FCRA), 15 *U.S.C.* § 1681, which granted individuals various protective rights. In 2003, President George W. Bush signed into law the Fair and Accurate Credit Transactions Act of 2003 (FACTA), *Pub.L.* No. 108–159 (2003) as an amendment to FCRA. Under FACTA, every American has the right to a free annual copy of his or her credit report from each of the three nationwide agencies, which are Equifax, Experian and TransUnion.[3] A clear

---

3 *See* www.state.nj.us/dobi/division_consumers/finance/creditreport.htm (last visited January 2, 2015). AnnualCreditReport.com is the official site to help consumers to obtain a free credit report from the nationwide agencies. This central site allows one to request free reports once every twelve months. In conjunction with the Federal Trade Commission, the three major credit reporting agencies established the AnnualCreditReport.com website in order to provide

purpose of this legislation is to help consumers more easily monitor their reports on a reasonably frequent basis, so that they may take timely corrective action against erroneous negative information before further economic damage occurs.

██ For the foregoing reasons, when a court of equity imposes a retroactive child support obligation resulting in newly assessed arrears upon a party, the court must also logically have equitable discretion to direct the probation department not to report such arrears to the credit reporting bureaus unless and until further order. This point is implicitly supported in the AOC's publication, "Credit Reporting of Child Support Debts," page 2, which states in pertinent part: "The court may issue an order directing the case not be reported." https://www.judiciary.state.nj.us/prose/ 10751_credit_reporting_cs_debts.pdf (last visited January 2, 2015). Logically, the same principle may equitably apply for other possible consequences of child support arrears as well, including but not limited to loss of driving privileges under *N.J.S.A.* 2A:17–56.41 ("revocation or suspension of license for nonpayment of child support") when such technical arrears exceed a specific threshold, but do not arise from a violation of a court ordered financial obligation.

 For certain, timely payment of child support is critical to safeguard a child's best interests. A child is entitled to be supported by both parents, not just one. It is well-settled that generally speaking, each parent has a duty to support a child. *See Greenspan v. Slate,* 12 *N.J.* 426, 430, 97 *A.*2d 390 (1953). Further, the New Jersey Legislature has determined that it is the public's best interest to encourage parents, post-divorce, to share the rights and responsibilities of child-rearing. *See Pascale v. Pascale,* 140 *N.J.* 583, 591, 660 *A.*2d 485 (1995) (citing *N.J.S.A.* 9:2–4). Following divorce, a child support order is generally necessary to ensure that a child's basic needs are provided by his or her

consumers with the ability to obtain their credit reports once per year at no cost. *See Facts for Consumers* Federal Trade Commission (March 2008).

parents, who might otherwise neglect their responsibilities of child rearing. *Id.* at 590, 660 *A*.2d 485.

 That being stated, every child support order must also be reasonable. This concept applies not only to the amount of child support, but to all other aspects of the obligation as well, including reporting of arrears to credit bureaus. In the present case, plaintiff now has a court-ordered, retroactively imposed child support obligation. Further, she has an affirmative obligation to repay arrears in the child's best interest. Under the circumstances, however, the court directs that probation should refrain from reporting such arrears as delinquent to the credit reporting agencies unless and until further court order, and should override any automated computer action to the contrary.

The written order in this matter will expressly include the following language: "The court expressly notes that the plaintiff's arrears under this order are technical in nature and that she has never violated the terms of any existing child support order." This provision may help clarify any future ambiguity or questions which plaintiff may potentially confront regarding the existence of the present arrears.

If, however, plaintiff incurs additional future arrears in violation of the child support order, or otherwise fails to pay her ongoing child support obligation and technical arrearages under the repayment schedule set forth herein, then defendant may file a follow-up enforcement application, seeking any and all relief deemed equitable by the court at the time. Such relief may in the court's discretion include, but not necessarily be limited to, an order directing probation to notify the credit bureaus of the obligor's child support delinquency.