**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0412-18T3

CHRISTINE DALENA,

    Plaintiff-Respondent,

v.

DANIEL T. DALENA,

    Defendant-Appellant.

_____

> Submitted September 30, 2020 – Decided October 13, 2020
>
> Before Judges Fisher and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FM-19-0071-12.
>
> Daniel T. Dalena, appellant pro se.
>
> Laufer, Dalena, Jensen & Bradley, LLC, attorneys for respondent (Michelle A. Benedek, of counsel and on the brief, William M. Laufer, on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant Daniel Dalena appeals from a final order and other interlocutory orders that collectively awarded plaintiff Christine Dalena reimbursement of, among other things, college tuition expenses for the parties' three children. Daniel contends the trial judge misconstrued the emancipation and college expenses provisions in the parties' property settlement agreement (PSA), as well as in entering the orders that compelled his payment of counsel, mediation and late fees. We find no merit in any of his arguments and affirm.

The parties to this matrimonial action are both attorneys. They married in 1989 and had three children: Matthew, Brielle, and Justin, who were born in 1991, 1993, and 1998, respectively. The parties separated around 2002, and the children continued to live with Christine in the marital home.

Christine filed a complaint for divorce in 2011; Daniel filed a counterclaim seeking the same relief. They resolved all their existing differences, and a dual judgment of divorce, which incorporated the PSA, was entered on January 30, 2013.

The PSA stipulated that the parties both waived alimony and that Christine would be the primary custodian of the children, who were then twenty-one, nineteen, and fourteen. Of particular interest here is the parties' stipulation that

emancipation would result from the first of six events: (1) a child's death; (2) a child's marriage; (3) the child's graduation from high school and reaching the age of eighteen "or the completion of four . . . continuous academic years of college or vocational education or other post-high school education, which shall commence within six months from graduation of high school, whichever last occurs"; (4) the child's entry into the military; (5) the "termination of education or engaging in full-time employment or upon and after the obtaining by the child of eighteen . . . years of age"[1]; and (6) any other circumstance acknowledged by law. The third and fifth subsections are implicated here.

The PSA also addressed college costs and selection, requiring unemancipated children to

> apply for any financial aid and scholarships that may be available to help defray the costs of their attendance at college [and] to apply for student loans for 2 of their 4 years at college (not to exceed $10,000.00 per child in the aggregate) so that all children are treated fairly.

After the deduction of financial aid, student loans, and scholarships, both Christine and Daniel agreed "to be equally (50/50) responsible for the net college educational costs of the minor children." They also stipulated "[t]he

---

[1] The PSA limits the impact of a child's "partial employment" in specific ways not relevant to our disposition of this appeal.

A-0412-18T3

choice of where the child[] shall attend college" would be agreed upon by both parents and the child, and that such "consent shall not be unreasonably withheld, so as to ascertain the reasonableness of the costs thereof and the appropriateness of said curriculum."

Of interest as well is the PSA's provision that all the support provisions "are non-modifiable regardless of any change in circumstances," and the parties stipulated they had "considered all foreseeable and unforeseeable events occurring to either of them in accepting these provisions."

The parties moved and cross-moved numerous times about child-related issues between 2013 and 2017, resulting in the entry of numerous orders. Issues that could not be resolved on the papers were developed during a three-day evidentiary hearing in July 2018, and the following month the judge entered an order resolving all remaining issues.

Daniel appeals, arguing that the judge erred: (1) in imposing on him certain costs arising from Matthew's education; (2) in failing to consider Brielle emancipated on an earlier date; (3) in finding the costs of Justin's attendance at Muhlenberg University to be reasonable; (4) in awarding Christine $3000 in attorneys' fees; (5) in requiring Daniel's payment of certain health insurance costs that he claims were undocumented; (6) in imposing penalties for Daniel's

A-0412-18T3

late payments; (7) in adjusting Daniel's share of the mediation costs; and (8) "in more than doubling the judgment th[r]ough QDRO."[2] We find insufficient merit in the last five of these issues to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). And, for the reasons that follow, we reject the first three issues, in which Daniel challenges the relief granted to Christine arising from her bearing of certain college expenses for all three children.

Matthew. The record reveals that Matthew started his college education in the south in 2009. After one semester, Matthew transferred to a New Jersey college, and then transferred for the start of his sophomore year to the University of Maryland, which he attended without interruption through his fourth year. In 2013, during Matthew's fourth year (his third at the University of Maryland), the parties entered into the PSA. Around the same time, Matthew was advised by the University of Maryland that although the credits he earned at the schools he

---

[2] In the eighth point, Daniel claims that while the trial judge ascertained that he was obligated to Christine for all the items in question in an amount slightly in excess of $60,000, the qualified domestic relations order (QDRO) authorized the withdrawal of slightly less than $130,000 from Daniel's 401K. This, however, did not double his liability to Christine; the judge found, based on information from an accountant, that this was the "grossed-up" amount necessary to provide for any taxes, penalties, and fees from the withdrawal while netting Christine the $60,000 amount she was owed. If Daniel was desirous of avoiding this consequence, he need only have paid the $60,000 to Christine in the months allowed him prior to entry of the QDRO. We find no abuse of discretion in this disposition.

5

attended his freshman year had been accepted, he was still required to complete two other courses to fulfill Maryland's core requirements. Matthew was allowed to participate in the May 2013 graduation proceedings, but the school would not release his diploma until the two courses were completed. Matthew completed the required courses at the County College of Morris (CCM). Christine bore the expense.

Daniel asserted that he was not obligated to share in either the expense incurred for the two CCM courses or for child support accruing after the graduation ceremony at the University of Maryland in May 2013. In his view, Matthew was then emancipated under the PSA definitions quoted above. In seeking Daniel's share of the CCM expenses, Christine did not seek child support relating to Matthew after May 2013. She only sought Daniel's share of the CCM expenses, which amounted to less than $1000. In ruling on the papers, the motion judge determined that these expenses were "reasonable and necessary in order for Matthew to complete his college requirements" and graduate from Maryland, concluding that Daniel should be held liable to reimburse Christine for half that amount.[3]

---

[3] The record provides differing numbers for these amounts. It suffices for our purposes to note that the total expenditure for which Christine sought relief was

A-0412-18T3

Daniel's argument is that Matthew should have been deemed emancipated in May 2013, and he should not be held accountable for his share of this additional minor cost that accrued shortly thereafter. We agree that the obligation to pay college expenses was not so rigidly prescribed in the PSA or in law as to free a parent from paying a share of such an expense. Neither the child nor the parent willing to bear the expense need turn such square corners to secure an unwilling parent's fair and equitable share of a necessary college expense.

Brielle. When the parties entered into the PSA, Brielle was in her sophomore year at the University of Delaware. For various reasons, she decided – and with Daniel's encouragement – to take a leave of absence with the firm intention of returning to school the following Fall. The parties agreed to allow Brielle to spend time in Europe during this sabbatical; in fact, Daniel agreed to bear one-third of the expenses. Christine advanced the necessary funds and Daniel paid $800 toward his portion but later failed to reimburse the remaining share of slightly more than $500.

---

less than $1000, so Daniel's share – the sole amount in question in the disposition of the Matthew-related claims – was less than $500.

A-0412-18T3

In February 2013, after Brielle returned from Europe, Daniel agreed to let Brielle work part-time as an intern in California for a few months while she applied to other colleges. She resided in California with a cousin of Christine's, and Daniel paid a portion of her expenses. In April, she requested her parents' permission to complete a second internship during the summer, anticipating this would enhance her employment search after graduation. In May, Daniel agreed to pay one-third Brielle's expenses provided he received a sixty-day extension to make a payment of unpaid pendente lite support. Christine agreed and advanced all the funds Brielle required to stay in California; Daniel ultimately failed to reimburse his share.

During the second internship, Brielle applied to and was accepted at a number of colleges. Due to an omitted transcript from her application, the University of Maryland delayed her admission until January 2014, and so Brielle remained in California and took a class at UCLA. She resumed her full-time college education at Maryland in January 2014, and Daniel voluntarily paid his share of her tuition and board for the Spring 2014 semester.

By motion, Daniel argued Brielle became emancipated when she took a break in her college education in 2013. We reject Daniel's argument that the requirement in the PSA that a child be emancipated at the age of eighteen unless,

among other things, the child is engaged in and completes "four . . . <u>continuous</u> academic years of college" (emphasis added), compelled a ruling that Brielle was emancipated when she took a leave of absence in January 2013 to travel abroad for a month and then to take two internships in California before returning to school in 2014. The break Brielle took from school was with the consent and encouragement of both parents; Daniel participated in Brielle's consideration of taking a leave of absence, consented to it, knew she fully intended to return to college, approved her plan to complete the two internships in California and agreed to contribute to the expenses incurred, was involved in Brielle's applications for returning to school in 2013, and voluntarily made payments toward her Spring 2014 tuition and other expenses. The judge correctly determined that Brielle had not moved beyond the sphere of her parents' influence. See <u>Fillipone v. Lee</u>, 304 N.J. Super. 301, 308 (App. Div. 1997). We agree and conclude that it would be inequitable for a parent – after agreeing to and contributing toward a child's leave of absence from school – to hold that sabbatical against the child, or, ultimately, against the more understanding parent who contributed more than a fair share to the remaining college expenses. In addition, we have not viewed a brief break in a college

education as compelling emancipation in all circumstances. See Keegan v. Keegan, 326 N.J. Super. 289, 295 (App. Div. 1999).

Lastly, we note – as Christine argues – that the parties, as a result of a later round of motions, entered into a consent order that declared Brielle emancipated as of June 1, 2016. Having consented to the entry of that order without any attempt to reserve a right to challenge the earlier order, Daniel cannot now complain that Brielle was emancipated at an earlier date.

Justin. Unlike his siblings, Justin did not attend the University of Maryland but instead matriculated at Muhlenberg University. Daniel argues that what he was ordered to pay toward Justin's education was unreasonable. We affirm the order in this regard substantially for the reasons set forth in the judge's thorough and thoughtful fifty-one-page written opinion. We add only the following brief comments.

Devoting only slightly more than two pages of legal argument to this point, and with little specification to the record and few citations to legal authorities, Daniel poses three separate questions about the judge's determination.

First, Daniel argues that the cost of Justin's education exceeded that incurred for his siblings. Daniel claims that "nothing could be more fair and

reasonable tha[n] to put all three children on a similar status with respect to college costs."  While it is true that the PSA exhibits a desire that all three children be "treated fairly" in this regard, there is nothing about the relevant PSA provisions that limits a parent's required contribution to that which was paid for other siblings or that the obligation for a younger child is somehow capped at the amount expended for older children.  Moreover, the judge conducted an evidentiary hearing about the reasonableness of the expenses and the fairness of requiring Daniel's contribution and made findings, which command our deference.  See Cesare v. Cesare, 154 N.J. 394, 412 (1998).  Even if the polestar for fixing a reasonable cost is what was expended for Justin's older siblings, the judge found that the expense of sending Justin to Muhlenberg University was not significantly greater than the cost of sending the others to the University of Maryland when factoring in Justin's $10,000 annual merit scholarship.  In short, finding such a similarity in expenditures, the judge concluded that the cost for sending Justin to Muhlenberg was reasonable and that it was fair and equitable to require Daniel to equally share in those costs. We defer to those findings.

Second, Daniel argues that the lack of a sound relationship between he and Justin somehow excuses or limits his obligation to contribute to Justin's

education.  Not so.  See Gac v. Gac, 186 N.J. 535, 546 (2006).  In any event, the judge was justified in finding that Daniel – not Justin – was the cause for the rift in their relationship because Justin viewed his father as having made his mother's life "a living hell."

Third, Daniel asserts that the judge was biased against him.  He bases this contention on the fact that the trial judge relied on testimony that Daniel asserts never occurred.  In his written opinion, the judge referred to the fact that Justin was "understandably emotional as his father continued to badger and challenge him on cross-examination."  The judge added that, "[d]espite the level of hostility defendant created through his cross-examination," when Justin was asked by Daniel "'Why do you hate me?' Justin's honest reply was that 'I can't say I hate you.'"  Daniel argues that neither the quoted question nor the quoted answer appear in the trial transcript.

Our review of the transcript confirms Daniel's argument that he never asked that question and Justin never gave that answer.  It may be the judge rendered his decision without the aid of a transcript and interpreted what transpired during the 158 pages (single-spaced) of similar cross-examination as the equivalent of the nonexistent question and answer he included in his written

decision.[4] The point of the judge's finding was that in an attempt to demonstrate through this rigorous cross-examination that he was not the cause for the rift between the two, Daniel in fact proved exactly why Justin was justified in feeling about Daniel the way that he did. Having carefully examined the entire transcript, including the cross-examination in question, and the judge's written decision, we find absolutely no evidence of bias. Indeed, we see too often disgruntled litigants hurling such accusations against our able family judges; sadly, this unsupported accusation comes from a member of the Bar who should know better.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] For example, it may be that the judge was recalling Daniel's asking Justin: "Do you love me?," to which Justin responded, "Absolutely." That question, of course, sounds like the opposite of what the judge said in his opinion, but that actual question ("Do you love me?") was an opportunity for Daniel to elicit from his son, who was highly emotional during cross-examination – as is clear even from a reading of a transcript, let alone the judge's express findings – to say that he hated his father. There are other examples during the lengthy cross-examination that could have led the judge to mistakenly recall the quoted question and answer that never seems to have occurred. There was one exchange in which Daniel attempted to badger Justin into saying that he (Daniel) was "the least important person in our family." Also, in response to an objection, Daniel argued to the judge that he was trying to show why Justin was "ang[ry] with me and why he ha[d] a dislike [for] me," which the judge could also have mistakenly equated with the thrust of the entire, painful cross-examination, the purpose of which was to show that Justin did not like his father and that, in Daniel's view, there was no reason for such feelings. In any event, we find no significance in the judge's mistaken recollection about the cross-examination.